UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

STACY BOWERS, #245674,      )
                            )
              Plaintiff,    )        Case No. 1:08-cv-469
                            )
v.                          )        Honorable Paul L. Maloney
                            )
DAVE J. BURNETT, et al.,    )
                            )        **REPORT AND RECOMMENDATION**
              Defendants.   )
_____)

       This is a civil rights action brought *pro se* by a state prisoner under the Religious

Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-2(a) and 42 U.S.C. § 1983. Plaintiff

is serving a life sentence on his second-degree murder conviction. He is currently an inmate at the

Earnest C. Brooks Correctional Facility (LRF). His complaint relates to the conditions of his

confinement in June and July of 2007 at the St. Louis Correctional Facility (SLF). (Compl., ¶ 1,

docket # 1). The defendants are SLF's Chaplain, Billy Ray Thompson and Dave J. Burnett, former

Special Activities Coordinator of the Correctional Facilities Administration (CFA). Plaintiff alleges

that defendant Thompson violated his First Amendment rights and statutory rights under RLUIPA

on June 25, 2007, when after interviewing plaintiff regarding his request for a special vegan[1] diet

under Policy Directive 05.03.150, Thompson recommended that plaintiff's request be denied.

Defendant Burnett allegedly violated those same rights on July 6, 2007, when he denied plaintiff's

---

[1]A vegan diet is a "strict vegetarian diet" containing "no animal-based food products, including dairy and egg products." *Spies v. Voinovich*, 173 F.3d 398, 402 n.1 (6th Cir. 1999).

request for a "strict vegetarian Buddhist diet." (Compl., ¶¶ 2-10). Plaintiff sued defendants in their individual and official capacities. (*Id.*, ¶¶ 2-3). He seeks an award of monetary damages and declaratory and injunctive relief. (*Id.*, ¶ 11).

The matter is now before the court on defendants' motion for summary judgment. (docket # 14). Plaintiff requested and received a lengthy extension of time within which to file his response. (12/09/08 Order, docket # 22). Plaintiff has now filed his response (docket #'s 23-25) and defendants' motion is ready for decision. For the reasons set forth herein, I recommend that defendants' motion for summary judgment be granted in part and denied in part. I recommend that the portion of defendants' motion seeking summary judgment based on the affirmative defense of plaintiff's failure to properly exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) be denied. I recommend that the remainder of defendants' motion for summary judgment be granted, and that judgment be entered in defendants' favor on all plaintiff's claims.

A.     Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *S.S. v. Eastern Ky. Univ.*, 532 F.3d 455, 452 (6th Cir. 2008). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *El Bey v. Roop*, 530 F.3d 407, 413 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in

favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where, however, a moving party with the burden of proof seeks summary judgment, he faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to

disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). This higher standard applies to the portion of defendants' motion seeking summary judgment based on 42 U.S.C. § 1997e(a) because lack of exhaustion under 42 U.S.C. § 1997e(a) is an affirmative defense.

> B.    Standards Applicable to Affirmative Defense of Failure to Exhaust Remedies

Defendants have asserted the affirmative defense of plaintiff's failure to exhaust administrative remedies. A prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies. 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 220 (2007); *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 734. In *Jones v. Bock*, the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. The burden is on defendants to show that plaintiff failed to properly exhaust his administrative remedies. The Supreme Court reiterated that "no unexhausted claim may be considered." 549 U.S. at 220. The Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not

dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims. 549 U.S. at 219-24.

In order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Jones v. Bock*, 549 U.S. at 218-19. In *Woodford v. Ngo*, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. Thus, when a prisoner's grievance is rejected by the prison as untimely because it was not filed within the prescribed period, the prisoner's claim is not "properly exhausted" for purposes of filing a § 1983 action in federal court. *Id.* at 90-93; *see* 42 U.S.C. § 1997e(a).

MDOC Policy Directive 03.02.130 (effective July 9, 2007) sets forth the applicable grievance procedures.[2] (*See* docket #17, Ex. D). Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond their control. *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what,

---

[2]The March 5, 2007 version of the policy directive (docket # 15, Ex. F) applies to plaintiff's Grievance No. SLF-07-06-00913-20e, which he filed on June 11, 2007. A separate discussion of the March 2007 version of the policy directive is not necessary, because the differences between the March 2007 and July 2007 versions of the policy directive are inconsequential.

when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). Thus, where an individual is not named in the Step I grievance, or his or her involvement in the issue being grieved is not indicated, or the individual is mentioned for the first time during an appeal of a denial of a grievance, the claims against that individual are not properly exhausted. *See Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020, at * 16 (W.D. Mich. Sept. 30, 2008) (collecting cases); *accord Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009).

      The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. P.D. 03.02.130 at ¶¶ W, X. If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Step II respondent is generally the warden. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing ...." *Id.*

Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process. An argument that it would have been futile to file a grievance does not suffice. Assertions of futility do not excuse plaintiff from the exhaustion requirement. *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir.1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations."); *see Booth v. Churner*, 532 U.S. at 741 n. 6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *Jones v. Douglas*, 108 F. App'x 254, 256 (6th Cir. 2004).

## **Proposed Findings of Fact**

The following facts are beyond genuine issue. Plaintiff is serving a live sentence in the custody of the Michigan Department of Corrections on his 1995 criminal conviction for second-degree murder. He was an inmate at the St. Louis Correctional Facility (SLF) in June and July of 2007 when the events forming the basis of his complaint occurred.

On June 25, 2007, SLF's Chaplain Billy Ray Thompson interviewed plaintiff in response to plaintiff's request for the accommodation of a religiously-based diet. Plaintiff had identified himself as a Buddhist for approximately three months. During the interview, plaintiff demonstrated little knowledge of the Buddhist faith. He stated that he could not eat meat because doing so would require killing an animal, and that such killing was prohibited by one of the Five Precepts of his newly-adopted faith. SLF's non-meat menu satisfied the precept of not killing animals. (docket # 15, Ex. B, Thompson Aff., ¶¶ 2-4). The precept that one should not kill animals

failed to explain why plaintiff needed to abstain from eating dairy products. On June 25, 2007, Chaplain Thompson sent a memorandum to defendant Burnett recommending that plaintiff's request for a strict vegetarian diet be denied:

[P]risoner Bowers # 245674 was interviewed on June 25, 2007 and responded to the Buddhism strict Vegetation [sic] diet questions as follows:

a. Briefly explain the major teachings of your designated religion.
Prisoner states Buddhism has (4) Four Noble Truths related to Suffering: 1. Life is Suffering; 2. cause/origin of Suffering; 3. end of suffering; and 4. the path of the end of Suffering.

b. Why is a Buddhist diet required by this religion?
Prisoner responded: "Because of the Five Precepts of Buddhism: 1. No Killing; 2. No Stealing; 3. No Lying; 4. No Sexual Misconduct; and 5. No Taking-in [of] intoxicants. Number one, no killing. No killing of any living Being is the basic reason why this diet is required. It includes humans, bugs, anything with life in it. And because of good health. No dairy products are allowed because it [sic] comes from animals.["]

c. What is a Strict Vega[n] meal, in other words, how does it differ from food otherwise provided by the facility? "Buddhist meal is strictly a vegetation meal with no dairy products.["]

d. What types of foods are not allowed? No Meat, No dairy products.

Prisoner asked if he had any further comments: "Because I have chosen this as my Primary Religious Path, I need to follow the guidelines of he path. And partaking of a strict vegetation diet is part of that path."

Prisoner Bowers #245674 has limited knowledge of Buddhism and the requirements, but strikes me as sincere in his pursuit of the religion. I recommend disapproval at this time.

(*Id.*, Ex. B-1). Chaplain Thompson did not have the power to grant or deny plaintiff's request for placement on a strict vegetarian diet. (Thompson Aff. ¶ 6).

On July 6, 2007, Special Activities Coordinator Dave Burnett denied plaintiff's request for a vegan diet. (docket # 15, Ex. A-1). Burnett observed that plaintiff had most recently

-8-

identified himself as a Buddhist for roughly three months. Plaintiff had "self-identified" as a Buddhist at some earlier times during his incarceration." (*Id.*). Plaintiff had requested a "Buddhist diet," but the MDOC does not provide a "Buddhist diet" because there are many different schools of Buddhism and they have varying dietary requirements. (Burnett Aff., ¶¶ 6-7). Plaintiff had related during his interview that this request for a special diet was based on his belief that one should not kill animals. Burnett observed that plaintiff's professed need to avoid killing animals could be met by eating from SLF's non-meat menu. The non-meat menu option is available at all Michigan's prisons. (*Id.*, ¶ 8). The cost to the State of Michigan of providing a prisoner with a vegan diet is higher than the cost of providing the prisoner with non-meat menu meals. (*Id.*, ¶ 11).[3] Defendant Burnett noted that plaintiff's minimal information about his faith's beliefs was an indicator of his possible motivation for a desire for a transfer to another prison rather than the sincere pursuit of a

---

[3]Plaintiff argues that paragraph 11 of Burnett's affidavit has no evidentiary value and that it should be disregarded by the court because defendant Burnett lacks adequate personal knowledge regarding the relative costs to the State of Michigan of providing a prisoner with non-meat meals or strict vegetarian meals. (Plf. Brief at xiii, docket # 24). This argument is meritless. Burnett was the CFA special activities coordinator from 1995 until his recent retirement. (Burnett Aff. ¶ 3). For more than a decade it was Burnett's job as the CFA's special activities coordinator to make the MDOC's decision whether to grant or deny a prisoner's request for a religious diet accommodation. (*See* docket # 15, Ex. C, P.D. 05.03.150, ¶ TT). Burnett has been sued on numerous occasions by prisoners dissatisfied with his decisions. *See, e.g., Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020 (W.D. Mich. Sept. 30, 2008). Few prisoner requests for vegan diets would have been denied if the State found that it was less expensive and administratively easier to provide such meals. I find that defendant Burnett has more than sufficient personal knowledge to testify regarding the State's relative costs of providing its prisoners with special meals. *Id.* at 2; *cf Dawson v. Burnett*, No. 1:08-cv-363, 2009 WL 1230318, at * 3 (W.D. Mich May 4, 2009). Burnett is not an accountant and he never purported to supply an exact breakdown of the cost differential, but he certainly was in a position where he knew that there is a cost difference and that the difference was not insignificant. Plaintiff's objection goes to the weight rather than the admissibility of paragraph 11. By contrast, plaintiff offered no evidence rebutting the evidence that "[t]he cost for providing the strict vegetarian diet menu is very costly when compared to the non-meat menu." (Burnett Aff. ¶ 11).

religious belief. Burnett observed that many Buddhists eat eggs and dairy products. Plaintiff did not supply defendant Burnett with a religious rationale why he could not eat dairy products. Obtaining milk did not involve the killing of animals. During his interview, plaintiff had not mentioned any prohibition against consuming eggs. Burnett found that SLF's non-meat menu would accommodate plaintiff's religious beliefs. On July 6, 2007, based on the record presented, defendant Burnett denied plaintiff's request for a special vegan diet. (*Id.*, Ex. A-1).

## A. Events Occurring after the July 6, 2007 Denial of Plaintiff's Request

Plaintiff states that since September 2007, he has studied the teaching of the Chuang Yen Monastery (Plf. Aff., ¶ 8, docket # 25) and that he "primarily follow[s] the Mahayana school" of Buddhism. (*Id.*, ¶ 5). According to plaintiff, "Buddhism is one of the most complex religious philosophies known to man." (*Id.*, ¶ 10). Buddhism "encompasses countless schools, each having countless sects, and the beliefs and practices vary greatly from one to another." (*Id.*). He states that he has studied Buddhism long enough to know that he is not a Zen Buddhist and that he "sternly disagrees with the Zen school and find[s] it offensive." (*Id.*, ¶ 9). Plaintiff's February 9, 2009 affidavit emphasizes that his current school of Buddhism prohibits his consumption of dairy products and eggs:

6. It is my belief that an egg is life. When an egg is taken from its nest and used for food, a murder has been committed. For these reasons, I believe it is wrong to consume an egg or any product with an egg in it.

7. Dairy products are obtained, for the most part, from living creatures. Admittedly, dairy products are almost exclusively obtained from living creatures. However, my beliefs bring forth three objections to consuming dairy products. First, it is not known whether or not the animal suffers from any pain or discomfort by providing products for consumption by humans. Second, I believe that consuming these products is also a consumption of the energy or karma of that creature and my

-10-

understanding of Buddhism teaches me that this is a bad practice. Third, the Buddha advised that those "who do not wear silk, leather boots, furs, or down . . . and who do not consumer milk cream or butter, can truly descend this world. Both physically and mentally one must avoid, by neither wearing them or eating them. I say that such people have true liberation." Shurangama Sutra. As such the practice is prohibited by the teachings of Buddha in my school of Buddhism.

(Plf. Aff. ¶¶ 6-7). The above-quoted reasons why plaintiff was unable to eat dairy products and eggs in 2009 were never communicated to defendant Burnett before his July 6, 2007 decision denying plaintiff's request for a vegan diet. There is no evidence that plaintiff applied for a strict vegetarian diet at any time after July 6, 2008, as he was permitted to do under MDOC Policy Directive 05.03.150, ¶ SS.

Plaintiff was an inmate at the Earnest C. Brooks Correctional Facility (LRF) when he signed his 2009 affidavit in which he emphasized his general dissatisfaction with "prisoner cooks" and announced his preference that the pots and pans used for cooking his meals be kept separate from those used for the preparation of food for LRF's meat-eating prisoners:

11.    The Defendant [sic] ignorantly represent to this Honorable Court that the alternative "non-meat menu" is acceptable to Buddhism. As an initial matter, I am offended by such an ignorant and generic statement and hope that this Honorable Court is as well. Second, the Defendant [sic] has no knowledge of my detailed theology because Defendant [sic] has not undertaken any effort to learn my beliefs. Third, this overly presumptuous statement fails to take notice of the fact that the so-called "non-meat menu is contaminated by prisoner cooks who add meat broth to items such as greens, gravy, soup broths, which turn foods which started as acceptable to my religious tenets into something forbidden. Fourth, the Defendant [sic] fails to take notice of the fact that I am prohibited from eating eggs and dairy products which are found throughout the "non-meat menu" dishes -- including entree items. Fifth, the Defendant [sic] fails to take notice of the fact that the "non-meat menu" is prepared in pots, pans, and other cooking vessels which have been previously used to cook meat and other prohibited foods -- such practices are forbidden because there is no way to ensure that the forbidden items are not transferred into my "non-meat menu" items. Sixth, the Defendant [sic] fails to acknowledge that the "non-meat menu" is served side by side with the regular meat menu and foods are constantly cross contaminated by dirty serving utensils, sloppy practices, and other procedures which

would render the "non-meat menu" items which may otherwise be permitted into something unacceptable to my beliefs.

(Plf. Aff. ¶ 11). Defendant Burnett retired before September 29, 2008 (docket 15, Ex. A). Defendant Thompson is SLF's Chaplain. Neither defendant was responsible for the perceived prison food service inadequacies plaintiff listed in his 2009 affidavit.

### B. Plaintiff's Grievances

1. <u>Grievance Number SLF-07-06-00913-20e.</u>

On June 11, 2007, plaintiff filed Grievance Number SLF-07-06-00913-20e. (docket #15, Ex. D-1). This grievance did not include any complaint regarding actions taken by defendants Thompson or Burnett:

> This grievance is being wrote [sic] on Warden Lafler, Deputy Washington, and Acting Chaplain Armstrong for violation of [the] "Religious Land Use and Institutionalized Persons Act of 2000[,]" Section 3, Protection of Religious Exercise of Institutionalized Persons, which states in part[,] "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." Grievant has kited the people stated above about getting on Buddhist diet/strict diet. Grievant has declared his religion as Buddhist. [He] has gone to the callout. Grievant is taking Buddhist correspondence courses. Grievant's teacher[,] Rev. Adrienne Baska[,] will and is vouching for grievant that he will and can pass the so called "Buddhist test." Grievant seeks to be placed on the Buddhist diet which is mandatory for grievant['s] religion.

(docket # 15, Ex. D). On June 25, 2007, Captain Wilson provided the Step I response denying plaintiff's grievance. Wilson stated that Chaplain Thompson had interviewed plaintiff on June 25, 2007, and had forwarded his recommendation to CFA Special Activities Coordinator Burnett, and that no decision had yet been made on plaintiff's request. (*Id.*, Ex. D-1). Plaintiff never mentioned Chaplain Thompson until his Step II appeal, which stated as follows:

> Chaplain Thompson upon interview stated that my Buddhist knowledge is limited [and] my religious pursuit was sincere. Nonetheless, Chaplain Thompson recommended disapproval

of the diet. To deny my religious Buddhist diet would be a blatant violation of my 1st Amend. Const. right to free exercise of religion. Obviously, Chaplain's knowledge of const. law is limited as the U.S. sp [sic] court stated prisoner [sic] officials cannot deny a prisoner[']s exercise of rel. unless 1) its [related] to a legitimate penal interest/inst[itutional] concern; and the prisoner[']s beliefs are insincerely held. *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). The chaplain has confirmed my sincerity and no institutional concern exist[s] for failing to accommodate my request. This proves Chaplain Thompson[']s lack of and limited knowledge of const. law as he would have never requested my disapproval. SLF is effectively discriminating against the Buddhist faith is a violation of PD 05.03.150.

(docket # 15, Ex. D-2). On July 25, 2007, Warden Lafler denied plaintiff's Step II appeal. (*Id.*, Ex. D-3). Plaintiff pursued a Step III appeal which was denied on August 31, 2007. (*Id.*, Ex. D-4).

### 2. Grievance Number SLF-07-08-02029-28j

On August 31, 2007, plaintiff filed Grievance Number SLF-07-08-02029-28j. (docket # 15, Ex. G, docket # 24, Ex. G). In the space allotted for plaintiff to explain the steps he had taken to resolve the issue before filing the grievance, plaintiff wrote:

I did not receive the Step II Response until 7/2/07. On 7/2/07 I sent a letter to Special Activities Coordinator Dave Burnett inquiring why [he] denied my diet when Chaplain Thompson said my pursuit was sincere[,] and why I [had] never received a formal denial from him or SLF['s] warden. To date, I have received no response.

(docket # 15, Ex. G-1). Plaintiff went on to state in the body of this grievance that defendant Burnett's July 6, 2007 denial of his request for a special diet violated his rights under the First Amendment's Free Exercise Clause and his statutory rights under RLUIPA. He argued that because Chaplain Thompson had stated that plaintiff's pursuit of Buddhism was sincere, Thompson's recommendation "for denial was in error." (*Id.*). This grievance was rejected at Step I for failure to follow the appropriate procedure under P.D. 03.02.130. The remedy available to plaintiff if he did not receive a timely Step II grievance response was to pursue a Step III appeal rather than filing

a new grievance. (docket # 15, Ex. G-1). Plaintiff's statement of his reason for pursuing a Step II appeal clarified that this grievance was against defendant Burnett based on his denial of plaintiff's request for a "strict diet," and this was not a grievance complaining of the absence of a response to an earlier grievance. (*Id.*, Ex. G-2). Plaintiff's Step II appeal was denied for the reason stated in the Step I response and because this grievance was "duplicative" of Grievance Number SLF-07-06-00913-20e. (*Id.*, Ex. G-3). Plaintiff's Step III appeal was denied on October 8, 2007 for the reasons specified in the Step I and Step II responses. (*Id.*, Ex. G). Seven months later, on May 21, 2008, plaintiff filed his complaint.

## Discussion

### I.      Exhaustion of Administrative Remedies

Defendants argue that they are entitled to summary judgment because plaintiff did not properly exhaust his available administrative remedies as required by 42 U.S.C. § 1997e(a). (Deft. Brief at 5-7, docket # 15). Upon review, I find that the defendants are not entitled to summary judgment based on this affirmative defense.

Grievance No. SLF-07-06-00913-20e did not exhaust any claim against defendants Thompson and Burnett. Defendant Thompson was not mentioned until plaintiff's Step II appeal. Under Policy Directive 03.02.130, plaintiff was required to name Thompson in his Step I grievance in order to properly exhaust his administrative remedies. *See Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020, at * 16 (W.D. Mich. Sept. 30, 2008). Plaintiff's adding of Thompson in the process of appealing the denial of his grievance did not "properly exhaust" plaintiff's administrative remedies as required by 42 U.S.C. § 1997e(a). This grievance did not exhaust plaintiff's claim

against defendant Burnett because it was filed before Burnett made his decision on plaintiff's request for a special diet.

Grievance No. SLF-07-08-02029-28j was rejected on the grounds that it was an improper grievance regarding the absence of a grievance response and because it was "duplicative" of Grievance No. SLF 07-06-00913-20e. Plaintiff appealed the rejection of this grievance through Step III. This grievance was not "duplicative" of plaintiff's earlier grievance and it was not a grievance regarding the absence of a grievance response. Grievance No. SLF-07-08-02029-28j was filed in August of 2007 and in it plaintiff sought to challenge defendant Burnett's July 2007 decision denying his request for a vegan diet. Defendant Burnett has not established his affirmative defense under 42 U.S.C. § 1997e(a). It is a somewhat closer question whether Grievance No. SLF- 07-08-2029-28j exhausted plaintiff's administrative remedies against Chaplain Thompson. Although Thompson's recommendation was not the primary focus of the grievance, plaintiff did argue in the body of his grievance that Thompson's recommendation had been erroneous. I find that defendant Thompson has not carried his burden on this affirmative defense. Accordingly, I recommend that the portion of defendants' motion seeking summary judgment based on plaintiff's failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) be denied.

## II.    Mootness

Plaintiff is currently an inmate at the Earnest C. Brooks Correctional Facility (LRF). His claims for declaratory and injunctive relief are moot as a result of plaintiff's confinement at LRF. *See Cardinal v. Metrish*, 564 F.3d 794, 798-99 (6th Cir. 2009); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

### III.    Eleventh Amendment Immunity

#### A.    Constitutional Claims

Plaintiff's constitutional claims for monetary damages against defendants in their official capacities are barred by Eleventh Amendment immunity. Eleventh Amendment immunity is a threshold issue that should be raised and decided by the trial court. *See Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006). A suit against a state officer in his official capacity is simply another way of pleading an action against the state. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009). The Eleventh Amendment generally[4] bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Skinner v. Govorchin*, 463 F.3d 518, 524 (6th Cir. 2006). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's constitutional claims for monetary damages against defendants in their official capacities.

---

[4] The well-recognized exception to the general rule is an action for prospective, non-monetary relief such as an injunction against a state officer in his or her official capacity based upon a claim that the state officer's action is unconstitutional. *See Ex Parte Young*, 209 U.S. 123 (1908); *see also Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)(*en banc*).

### B. Statutory RLUIPA Claims

Defendants seek dismissal of plaintiff's statutory RLUIPA claims for monetary damages against defendants in their official capacities on Eleventh Amendment immunity grounds. The Sixth Circuit's decision in *Cardinal v. Metrish*, 564 F.3d 794, 799-801 (6th Cir. 2009) is controlling. The Eleventh Amendment bars plaintiff's RLUIPA claims for monetary damages against defendants in their official capacities.

### IV. RLUIPA Claims for Monetary Damages Against Defendants in Their Individual Capacities

Plaintiff sued defendants in their individual capacities for damages under RLUIPA. RLUIPA's section 3 provides that "[a] person may assert a violation of this chapter as a claim . . . in a judicial proceeding and obtain appropriate relief against a government."[5]  42 U.S.C. § 2000cc-2(a). The question presented is whether "appropriate relief" under this statute includes an action against defendants in their individual capacities for monetary damages. I find that RLUIPA, as an exercise of Congress' power under the Spending Clause, does not provide a cause of action for damages against defendants in their individual capacities.

The Sixth Circuit, in response to a "facial challenge" to section 3 of RLUIPA, upheld the statute as a valid exercise of Congress' power under the Spending Clause, Article I, section 8, clause 1 of the Constitution "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." *Cutter*

---

[5]The term "government" is defined in RLUIPA as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in clause; and (iii) any other person acting under color of State law." 42 U.S.C. § 2000cc-5.

*v. Wilkinson*, 423 F.3d 579, 590 (6th Cir. 2005). The finding that a statute is facially valid is an extremely narrow judicial determination. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005). Although the Sixth Circuit's holding that section 3 of RLUIPA as a facially valid exercise of Congress' Spending Clause power is narrow in its scope, the holding has critical consequences for the remedies available to an incarcerated plaintiff asserting a claim under the statute.

> An exercise of Congress' spending power is in the nature of a contract:
> Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)(internal citations omitted). RLUIPA's "contractual nature" limits the scope of remedies available under the statute. *See Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 287 (1998). When Congress attaches conditions to the award of federal funds under its spending power (as it has in Title IX and Title VI), the Supreme Court "examine[s] closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. Our central concern in that regard is with ensuring that the receiving entity of federal funds [has] notice that it will be liable for a monetary award." *Gebser*, 524 U.S. at 287 (internal citations and quotation marks omitted).

Defendants are not "recipients" of federal funds and cannot properly be held liable for monetary damages under Congress' Spending Clause powers:

> The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power. *See National Collegiate Athletic Assn. v. Smith*, 525 U.S. 459, 467, n. 5, 119 S.Ct. 924, 929, n. 5, 142 L.Ed.2d 929 (1999) (rejecting suggestion "that the private right of action available under ... § 1681(a) is potentially broader than the Government's enforcement authority").

*Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999); *see National Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999). Every federal appellate court that has addressed the issue has held that RLUIPA, as an exercise of Spending Clause power, does not authorize the imposition of liability against state employees in their individual capacities. *See Nelson v. Miller*, No. 08-2044, __ F.3d __, 2009 WL 1873500, at * 15-18 (7th Cir. July 1, 2009); *Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007). It is highly probable that the Sixth Circuit will join the Fourth, Fifth, Seventh, and Eleventh Circuits and hold that RLUIPA does not provide a cause of action for monetary damages against state employees in their individual capacities for monetary damages. I find that defendants are entitled to judgment in their favor as a matter of law on all plaintiff's RLUIPA claims for damages against defendants in their official capacities. Alternatively, for the reasons set forth in Section V(B), I find that defendants are entitled to qualified immunity on these claims.

## V.    Qualified Immunity

Plaintiff seeks an award of damages against defendants in their individual capacities under section 1983 and RLUIPA. Defendants' motion for summary judgment requests entry of judgment in defendants' favor on the basis of, among other things, qualified immunity. "The purpose of the qualified immunity defense is to protect public officials from undue interference with

their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *See Everson v.* Leis, 556 F.3d 484, 494 (6th Cir. 2009); *Hayes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007). The question whether qualified immunity attaches to an official's actions is a purely legal issue for the court. *See Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), endorsed a two-prong analysis for addressing qualified immunity issues. The first prong is whether the plaintiff has alleged and supported with evidence[6] facts showing that the defendant's conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 550 U.S.

---

[6]A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004).

372, 377 (2007); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). The second prong of the qualified immunity inquiry is whether the right was "clearly established at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201. Judges are permitted to exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Here, I find that the sequence endorsed by the Court in *Saucier* is appropriate, and the prongs of the qualified immunity analysis will be addressed in the order specified above.

A.      First Amendment Claims Under the Free Exercise Clause

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The latter clause is the Free Exercise Clause. The Supreme Court has held that by incorporation through the Fourteenth Amendment, the Free Exercise Clause applies to the States. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). A prisoner retains only those First Amendment freedoms which are "'not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system.'" *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001)(quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *see Turner v. Safley*, 482 U.S. 78 (1987). Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell v. Procunier*, 417 U.S. at 822-23. "The

Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the First Amendment must be evaluated under the test of *Turner v. Safley*, 482 U.S. 78 (1987). The Supreme Court noted that it is well established that lawful incarceration legitimately requires restrictions on many rights and privileges as a necessary consequence of a criminal conviction. *O'Lone*, 482 U.S. at 348.

> [S]uch a standard is necessary 'if prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 [ (1977) ]. Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in the affairs of prison administration.' *Procunier v. Martinez*, 416 U.S. [396], 407, 94 S.Ct. 1800, 40 L.Ed.2d 224 [ (1974) ].

*Turner*, 482 U.S. at 89. The familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost

to valid penological interests. Turner, 482 U.S. at 89-91. The Court's *O'Lone* opinion closed with the statement, "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353 (internal citation omitted).

In this instance, there is a valid, rational connection between the prison regulation and the legitimate governmental interests put forth to justify it. *See Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir.2003). The legitimate governmental interests are security and budgetary interests.[7] The State need not respond to particularized religious dietary requests to comply with the First Amendment. *See Kahey v. Jones*, 836 F.2d 948 (5th Cir. 1988). There is a legitimate governmental interest in running a simplified food service rather than a full-scale restaurant. *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir.2007). Consequently, a State may refuse in certain circumstances to provide religious-based diets, even where the prisoners are sincere in their requests. 486 F.3d at 122.

---

[7]The State of Michigan expends significant financial and administrative resources in attempting to accommodate prisoners' religious beliefs by providing them with special diets that do not offend those religious beliefs. The State's resources are finite, and prisoner demands for specialized diets and food preparation are not. The State of Texas recently found the financial and administrative demands posed by prisoner requests for special religiously-based diets to be overwhelming, and it declined to provide any special meals or the equipment necessary for preparing them in favor of simply providing pork-free and vegetarian alternatives to the regular food line. The Fifth Circuit, applying the *Turner* test, upheld the Texas policy. The Fifth Circuit also upheld the policy against a RLUIPA challenge, finding the policy to be the least restrictive means of furthering compelling governmental interests. 486 F.3d at 124-26. *See Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007). The court found that there was "a logical connection between the prison policy on inmate diet and the legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id.* at 122. Granting requests for specialized diets would be expensive, diverting resources from other penological goals. It would "place undue costs and administrative burdens on the prison system because of the likelihood of proliferation of such requests and the concomitant need to meet multiple distinct dietary requests." *Id.*

Prison security is not only a legitimate governmental interest, it is recognized as a compelling governmental interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir.2005); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir.2004) ("Institutional security is the most compelling governmental interest in a prison setting, and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting therefrom.").

In *Russell v. Wilkinson*, the Sixth Circuit rejected a similar claim by a Michigan prisoner who objected to a termination of his special diet under Policy Directive 05.03.150. Prisoner Russell alleged a violation of his First Amendment rights when he was denied kosher meals after prison officials determined that Russell had purchased non-kosher food from the inmate commissary. The Sixth Circuit held, "As the denial of kosher meals was based on Russell's obvious actions in not observing kosher food requirement outside meals, [defendant] had a legitimate penological interest in discontinuing Russell's request. That legitimate penological interest concerns the maintenance of prison discipline in the facility." 79 F. App'x at 177. Here, plaintiff has not disputed that he retained alternative means for practicing his Buddhist faith. In fact, he has provided specific details regarding how his religious beliefs have evolved since July of 2007 when his request for a special diet was denied. The impact that accommodation of the asserted constitutional right would have on guards and inmates is obvious: it would require not only special food, but a separate set of cooking and serving utensils and perhaps a dedicated food line, which would impose an unwarranted financial burden on the State of Michigan. There are no other readily available alternatives at a *de minimis* cost to valid penological interests.

-24-

Shortly after identifying himself as a Buddhist, plaintiff sought a vegan diet at the expense of Michigan's taxpayers. Although plaintiff blames defendants for not delving deeply enough into his "detailed theology," (Plf. Aff. ¶ 11, docket # 25), it was up to plaintiff to make his case for the religiously-based need for dietary accommodation. He did not supply an explanation why SLF's non-meat menu option would not satisfy the "one should not kill" portion of his newly-adopted faith. His affidavit states, with the benefit of hindsight, that if he had known in advance of his June 25, 2007 interview what questions he was going to be asked, his answers "would have been much more detailed in nature to avoid any misunderstanding or misinterpretation of [his] beliefs." (Plf. Aff. ¶ 10, docket # 25). Plaintiff's June 11, 2007 grievance, filed two weeks *before* the interview, shows that plaintiff was well aware that he would be called upon to provide an explanation of his religious beliefs and why those beliefs necessitated a vegan diet. No reasonable trier of fact could find that defendant Thompson's action of recommending that plaintiff's request be denied or that defendant Burnett's decision denying plaintiff's request violated plaintiff's rights under the First Amendment's Free Exercise Clause. *See Russell*, 79 F. App'x at 177; *see also Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020, at *21-22 (W.D. Mich. Sept. 30, 2008). I find that defendants are entitled to judgment in their favor as a matter of law on plaintiff's Free Exercise claims.

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement under *Saucier*, he would nonetheless fall short of showing that the right each claims a defendant violated was "clearly established" such that a reasonable official in the each defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right. 533 U.S. at 201. "This inquiry turns on the objective legal reasonableness of the action, assessed in

light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct.

at 822. The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the

underlying purpose of requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry

"'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"

*Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein v. City of*

*Dayton*, 440 F.3d 306, 316 (6th Cir. 2006). "'[T]he right the official is alleged to have violated must

have been 'clearly established' in a more particularized, and hence more relevant sense.'" *Lyons v.*

*City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466

F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity

would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that

an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right." *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987); *see Nadar v. Blackwell*, 545 F.3d 459, 473 (6th Cir.

2008)("[Q]ualified immunity applies unless *any officer* in the defendant's position would have

clearly understood that he was under an affirmative duty to have refrained from such conduct.").

"Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702

(6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201). Although it is not always necessary to find a case where identical conduct had previously been determined to be unconstitutional,[8] in light of preexisting law, the unlawfulness must be apparent. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). If judges are in disagreement on an issue at the time the defendant acted, it is "unfair" to later subject the defendant to monetary damages "for picking the losing side in the controversy." *Pearson*, 129 S. Ct. at 823. The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004). "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)). "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997). "The

---

[8]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'"

*Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427.

Plaintiff's argument against defendants' entitlement to qualified immunity is set forth verbatim below:

> Just as he did in Figel v Overton [263 F. App'x 456, 458 (6th Cir. 2008)] and Porter v Caruso [No. 1:05-cv-562, 2008 WL 3978972 (W.D. Mich. Aug. 22, 2008)] Defendant Burnett seeks qualified immunity on the basis that the right invoked by plaintiff was not clearly established. The Plaintiff's right to accommodation of his religious practices -- namely provision of certain foods -- has been clearly established in this country at least since Kahane [v Carlson, 527 F.2d 492, 495 (2d Cir. 1975)] and has certainly been established in the number of cases which the MDOC have [sic] burdened the courts with since then including Figel v Overton and Porter v Caruso. As such this argument is without merit. The Defendants['] actions clearly violate the First Amendment. Arguably denial of the meals could amount to an Eighth Amendment violation. Plainly, the process used by the Defendants is offensive to the Fourteenth Amendment. In those circumstances qualified immunity is not a privilege that the Court should give these Defendants.

(Plf. Brief at 11, docket # 24). Plaintiff's argument is patently meritless.[9] Qualified immunity is not a privilege. The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. at 815 (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818)). It is not something this court is free to "give" or "take" from the defendants. Plaintiff's reliance on the Second Circuit's *Carlson* decision is misplaced because it did not clearly establish the law within the Sixth Circuit. The Sixth Circuit's unpublished 2008 decision in *Figel v. Overton*, 263 F. App'x 456 (6th Cir. 2008) addressed an interlocutory appeal of lower

---

[9]Plaintiff never alleged an Eighth Amendment claim regarding his food. Defendants Thompson and Burnett were not responsible for prison food service. Plaintiff did not allege a due process violation and he cannot add such a claim by making vague allusions in a brief.

court decision denying qualified immunity under RLUIPA,[10] not the First Amendment's Free Exercise Clause.  The unpublished decision was entered long after the challenged actions by defendants Thompson and Burnett.  Similarly, this court's unpublished, August 22, 2008 decision in *Porter v. Caruso* could not clearly establish the law retroactively to actions taken more than a year earlier.

      Plaintiff has not carried his burden on the second prong of the qualified immunity analysis.  There was no clearly established authority in June 2007 that a prison chaplain violates an inmates rights under the First Amendment's Free exercise clause when he makes a non-binding recommendation that a prisoner's request for a special diet be denied.  Further, under *Spies v. Voinovich*, 173 F.3d 398, 407 (6th Cir. 1999), a state official does not violate a prisoner's rights under the Free Exercise Clause when he denies a prisoner's request for the accommodation of a vegan diet under circumstances where (1) the prisoner has not demonstrated to the official that the non-meat alternative diet otherwise available fails to satisfy the prisoner's religiously-based dietary needs; and (2) prisoner retains alternative means of exercising his religion.  Plaintiff has not disputed that he retained alternative means of practicing his Buddhist faith.  Plaintiff did not supply defendant Burnett with a religion-based explanation why he could not eat dairy products or eggs.  Plaintiff has

---

[10]In *Figel*, the appellate attorneys for the defendants presented an extremely weak argument claiming that defendants were entitled to qualified immunity because RLUIPA was a statute of questionable validity from the date of its enactment through the Supreme Court's May 10, 2005 decision in *Cutter v. Wilkinson*.  263 F. App'x at 458.  In a short, unpublished decision, the Court of Appeals held that "RLUIPA was presumptively constitutional," and affirmed the lower court's decision.  *Id.* at 460.  It does not appear that the parties before the Court of Appeals in *Figel* ever framed for the court the threshold issue of whether RLUIPA, as an exercise of Congress' Spending Clause power, authorized individual capacity damages claims.  As stated elsewhere herein, every federal appellate court that has addressed the issue has held that RLUIPA does not authorize such claims.

been in the custody of the MDOC since 1995 on his murder conviction, and it is beyond question that he was familiar with the meals provided by the MDOC in the institutional setting, including the egg and dairy product components the MDOC's non-meat meals. Plaintiff made no mention of any prohibition against eating eggs. He identified animals of the source of dairy products, without supplying any coherent explanation why dairy products were forbidden within the structure of his religious beliefs. The other reasons that plaintiff developed after defendant Burnett made his decision are irrelevant. Plaintiff has not shown that defendants' actions violated his clearly-established rights under the First Amendment's Free Exercise Clause. I find that defendants are entitled to qualified immunity.

B.    RLUIPA Claims

If, as anticipated, the Sixth Circuit joins the other Courts of Appeals and holds that RLUIPA does not authorize a claim for damages against defendants in their individual capacities, a separate discussion of the qualified immunity becomes unnecessary. *See Nelson v. Miller*, No. 08-2044, __ F.3d __, 2009 WL 1873500, at * 15-18 (7th Cir. July 1, 2009); *Rendelman v. Rouse*, No. 08-6150, __ F.3d __, 2009 WL 1801530, at * 4-6 (4th Cir. June 25, 2009); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007). Because the issue has not yet been definitively resolved by the Sixth Circuit, qualified immunity is addressed herein. Upon review, I find that defendants are entitled to judgment in their favor as a matter of law on plaintiff's individual capacity claims for damages under RLUIPA on the alternative basis of qualified immunity.

The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a). "The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The burden of proving the existence of a substantial burden rests on the religious adherent." *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007); *see Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733 (6th Cir. Dec. 10, 2007), *cert. denied*, 128 S. Ct. 2903 (2008); *see also Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002) ("RLUIPA . . . requires the complainant to show that his religious exercise was substantially burdened."). At the summary judgment stage, the plaintiff must present evidence of a substantial burden, and "unreasoned say-so" does not suffice. *See Gelford v. Frank*, 310 F. App'x 887, 889 (7th Cir. 2008).

RLUIPA does not define the phrase "substantial burden," and the Supreme Court "has not yet defined 'substantial burden' as it applies to RLUIPA." *Living Water*, 258 F. App'x at 733. In *Living Water*, the Sixth Circuit declined to establish a "bright line test" for determining a "substantial burden." *Id.* at 737. It held that the Supreme Court's Free Exercise jurisprudence provides the appropriate analytical framework. *Id.* at 733. The Sixth Circuit emphasized that in the Free Exercise context, the Supreme Court has made clear that the "substantial burden' hurdle is high." *Id.* "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] substantial burden must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash*

*Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).  A substantial burden is not established because the government's action makes the religious exercise more difficult or expensive.  *Living Water*, 258 F. App'x at 739;  *see Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813-14 (8th Cir. 2008).  It is patent from plaintiff's affidavit (docket # 25) that he plaintiff possesses alternative means of practicing his Buddhist faith.  On the present record, no reasonable trier of fact could find in plaintiff's favor on the "substantial burden" component of his  RLUIPA claims against defendants.

Assuming *arguendo* that plaintiff had presented evidence on which a reasonable trier of fact could find that either defendant's action had resulted in a "substantial burden" on plaintiff's exercise of Buddhist faith, and further assuming that RLUIPA claims for monetary damages against defendants in their individual capacities were viable, defendants would nonetheless be entitled to judgment in their favor as a matter of law on the basis of qualified immunity.  The rights that plaintiff claims under RLUIPA were not clearly established in June and July of 2007 when defendants Thompson and Burnett acted.  It is not sufficient for plaintiff to simply invoke the existence of the statute, because under the second prong of the qualified immunity analysis, "the right the official is alleged to have violated must have been 'clearly established' in a particularized, and hence more relevant sense."  *Lyons*, 466 F.3d at 428.  "The U.S. Supreme Court has not yet defined 'substantial burden' as it applies to RLUIPA.  Neither does the statute itself contain any definition of the term."  *Living Water*, 258 F. App'x at 733.  The Sixth Circuit did not address the issue of what constitutes a "substantial burden" under RLUIPA until its unpublished December 10, 2007 decision in *Living Water*, and the Court of Appeals has provided no additional guidance since the *Living Water* decision regarding what constitutes a "substantial burden."  The law regarding what

constituted a "substantial burden" was not clearly established in mid-2007 when the defendants acted, indeed, the law is not yet clearly established through the date of this report and recommendation. Defendants are entitled to summary judgment on the alternative basis of qualified immunity.

## **Recommended Disposition**

For the foregoing reasons, I recommend that defendants' motion for summary judgment be granted in part and denied in part. I recommend that the portion of defendants' motion seeking summary judgment based on the affirmative defense of plaintiff's failure to properly exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) be denied. I recommend that the remainder of defendants' motion for summary be granted, and that judgment be entered in defendants' favor on all plaintiff's claims.

Dated: July 27, 2009          /s/ Joseph G. Scoville
                              United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).